## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

| | |
|---|---|
| KRISTEN ROSE | Civil No.: |
| Plaintiff, | |
| v. | |
| DI NICOLA & DI NICOLA, LLC, JOSEPH M. DINICOLA, JOSEPH M. DINICOLA, JR., ABC COMPANIES 1-5 (fictitious names describing presently unidentified business entities), and JOHN DOES 1-5 (fictitious names of presently unidentified individuals), | **COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |
| Defendants. | |

---

Plaintiff Kristen Rose ("Plaintiff") by way of Complaint against Defendant Di Nicola & Di Nicola, L.L.C. ("Defendant D & D," or "Corporate Defendant"), Defendant Joseph M. Di Nicola ("Defendant Senior"), and Defendant Joseph M. Di Nicola, Jr. ("Defendant Junior") (collectively, "Defendants"), alleges as follows.

## <u>INTRODUCTION</u>

This is a troubling story of a New Jersey attorney who, for years, physically and emotionally harassed, intimidated, and abused his female paralegal, Plaintiff Kristen Rose.  When Plaintiff mustered the courage to stand up against his domestic abuse and harassment, the attorney fired her and, sadly, continues to harass and stalk her to this day.

Plaintiff was hired in 2019 as a paralegal for Defendant Senior and Defendant Junior, a father and son duo at their law firm in Carneys Point. Defendant Junior was Plaintiff's supervisor, and early on, he charmed Plaintiff and took her on dates, making sure to not reveal his dark and violent characteristics until he was in a position to completely control Plaintiff. This occurred when Plaintiff lost her place of residence, Defendant Junior asked Plaintiff to move in with him, and Plaintiff reluctantly agreed. Immediately thereafter, Defendant Junior's interest in Plaintiff turned into obsession and, unfortunately, severe physical and emotional abuse. He treated Plaintiff as his possession, ignored her attempts to break up with him, and prevented Plaintiff from leaving the residence. Only seven months into her employment, Defendant Junior's control over Plaintiff became violent and he smashed her head into a gate door. The physical abuse did not cease.

 

As this cycle of harassment and rage continued throughout her employment, Plaintiff felt powerless against the Defendants, father and son, who frequently asserted strong political connections within Salem County.  Plaintiff feared for her safety and career.  After nearly a year and a half of harassment, abuse, intimidation, Plaintiff again insisted that the relationship was over.  In direct response, Defendant Junior fired her employment and told her to remove her belongings from the office.  However, this was another tactic to strengthen his control over Plaintiff, as Defendant Junior cut off Plaintiff's income and continued to prevent her from leaving his residence.

Prior to her termination, Plaintiff was an exemplary employee, and her job performance was never at issue.  Clearly, Defendants' wrongful termination of Plaintiff was in direct retaliation for her decision to escape from the harassment, abuse, and intimidation she experienced working for Defendants and her complaints about her mistreatment.

Plaintiff's termination would not have occurred but for her gender and attempts to escape her brutally abusive relationship with Defendant Junior.  Accordingly, Plaintiff brings this lawsuit under the New Jersey Law Against Discrimination N.J.S.A. 10:5-1, *et seq.* ("NJLAD"), and New Jersey statutes for Assault to redress Defendants' egregious misconduct.

## **PARTIES**

1.     Plaintiff is an individual citizen of Delaware, and at all times relevant hereto was employed by Corporate Defendant as a legal assistant/paralegal.

2.     Corporate Defendant is a New Jersey Corporation with its principal place of business at 381 South Golfwood Avenue, Carneys Point, New Jersey 08069. At all times relevant hereto, Corporate Defendant is an "employer" as defined under the NJLAD.

3.     Defendant Senior, at all times relevant hereto, is an individual and an attorney at Defendant Corporate Defendant.   Upon information and belief, Defendant Senior is a citizen of Florida.  This claim is brought against Defendant Senior in his individual capacity and/or as an agent or servant of Corporate Defendant.

4.     Defendant Junior, at all times relevant hereto, is an individual and an attorney at Corporate Defendant.  Defendant Junior is a citizen of New Jersey.  This claim is brought against Defendant Junior in his individual capacity and/or as an agent or servant of Corporate Defendant.

5.     Defendants ABC Corporations 1 through 5 are currently unidentified business entities who have acted in concert with Corporate Defendant, and/or currently unidentified business entities responsible for the creation and/or implementation of harassment or anti-retaliation policies of Corporate Defendant,

and/or currently unidentified business entities who have liability for the damages suffered by Plaintiff under any theory advanced therein.

6.      Defendants John Does 1 through 5 are currently unidentified individuals who acted in concert with Defendants and/or currently unidentified individuals responsible for the creation and/or implementation of harassment or anti-retaliation policies of Corporate Defendant and are currently unidentified individuals who may have liability for the damages suffered by Plaintiff under any theory advanced herein.

## **JURISDICTION**

7.      The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2), because it is a civil action between citizens of a state and citizens or subjects of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      Plaintiff is a Delaware Citizen.  Defendant Junior and Corporate Defendant are New Jersey citizens while Defendant Senior is a Florida citizen.

9.      Plaintiff seeks recovery of compensatory damages, punitive damages, attorneys' fees, costs, and other legal and equitable relief, but has not specifically enumerated the amount in controversy in the Complaint. The entire amount in controversy exceeds the sum or value of $75,000.00

10.     Therefore, this Court has original jurisdiction over Plaintiff's claims by virtue of diversity of citizenship and satisfaction of the amount in controversy requirement of 28 U.S.C. § 1332(a)(2).

11.     Pursuant to 28 U.S.C. §§ 1441(a), venue lies in the United States District Court for the District of New Jersey, Camden vicinage, because the facts and circumstances that give rise to the complaint occurred in this district.

## FACTS COMMON TO ALL CLAIMS

12.     Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

13.     Plaintiff is a trained paralegal and has been working as such since 2012.

14.     Corporate Defendant is a law firm that is focused on private real estate, commercial and corporate practice.  According to its website, Corporate Defendant serves as Prosecutor in one Gloucester County municipality, attorney for two planning boards in Salem County, and an attorney for one Salem County municipality.  Upon information and belief, Defendant Junior is also Salem County's Special Labor & Litigation Counsel for Employment Matters.

15.     In or around December 24, 2018, Plaintiff commenced her employment with Corporate Defendant as a legal assistant/paralegal.  Plaintiff's responsibilities included answering phones, typing, filing, dictation, calendar, docket, email management, and interacting with the public and clients.

16.    At all times relevant herein, Defendant Senior and Defendant Junior were Plaintiff's supervisors.

17.    Within weeks of Plaintiff starting her job, Defendant Junior frequently talked to Plaintiff and sought to charm her without revealing his abusive and violent tendencies.  Plaintiff and Defendant Junior began a romantic relationship before Plaintiff knew that Defendant Junior was a domestic abuser.  Then, just two months after Plaintiff started working for Defendants, Defendant Junior asked Plaintiff to move into his house.  Plaintiff felt compelled to do so because she did not want to jeopardize her job and she needed a place to live—a fact that Defendant Junior was conveniently aware of at the time.  At this time, Defendant Junior had not revealed his true colors as a violent, abusive, and dominating predator.

18.    Defendant Junior targeted Plaintiff on the basis of her gender.

19.    Soon after moving into Defendant Junior's house, Defendant Junior revealed for the first time his violent and abusive behavior, which he unleashed on Plaintiff.  Defendant Junior had regular manic episodes where he yelled, intimidated, and harassed Plaintiff.  Plaintiff was the frequent target of his rage. Defendant Junior's behavior made Plaintiff extremely upset and uncomfortable, and her working environment was also inevitably intolerable.  Plaintiff fell victim to an extreme hostile work environment on the basis of her gender.

7

20.    Defendant Junior's home was a side-by-side that was next-door to Corporate Defendant's office.  At all relevant times, Defendant Senior lived on the other side within the same house.  Defendant Senior was keenly aware of Defendant Junior's manic characteristics and abuse of Plaintiff but allowed the extreme harassment of Plaintiff to persist.

21.    Defendant Senior occasionally allowed himself into Defendant Junior's home unannounced.   One morning, Defendant Senior walked into Defendant Junior's home, and he walked directly past Plaintiff while she was wearing only a sweatshirt.  Horrified, Plaintiff complained to Defendant Junior, who immediately cried laughing, and then laughed with Defendant Senior about it.

22.    Defendants' constant and extreme harassment of Plaintiff in and out of the workplace would not have occurred but for Plaintiff's gender.

23.    Plaintiff wanted nothing more than to leave Defendant Junior, her employment with Defendants, and to escape Defendant Junior's daily abuse, harassment, and intimidation.  But Defendant Junior set Plaintiff up, causing her to be physically and emotionally trapped.  Further, on multiple occasions Plaintiff told Defendant Junior she was leaving and packing her bags, and Defendant Junior would physically hold her down or grab her by her arms and wrists to stop her from leaving. Defendant Junior was unable to let go of the complete control he had had over Plaintiff for months.

24.     Plaintiff also feared if she left her job, Defendant Junior would retaliate against her by distributing negative job references and bad mouthing her to future prospective employers.

25.     After only seven months on the job, Defendant Junior's anger and abuse toward Plaintiff escalated to physical domestic violence.  On September 6, 2019, Plaintiff had begun to temporarily live in a hotel to hide from Defendant Junior. Plaintiff went to Defendant Junior's house to retrieve her cell phone and an argument ensued.  Defendant Junior smashed Plaintiff's head into a gate door that separates Corporate Defendant's office property from Defendants' house.  At the time of the attack, the parties were located on Corporate Defendant's office property. Defendant Junior's attack caused Plaintiff to break skin and bleed.  Plaintiff called the Carneys Point Police Department to protect her from Defendant Junior's escalating rage.  Upon arrival, the police saw dried blood on Plaintiff and observed she was in emotional distress.  Defendant Junior falsely stated to the police that the incident occurred on Defendant Junior's residential side of the gate.

26.     But for Plaintiff's gender, she would not have been a victim of domestic violence at the hands of her supervisor, Defendant Junior.

27.     Having the police called on Defendant Junior for assaulting Plaintiff did nothing to deter his violent behavior toward Plaintiff.  Throughout Plaintiff's employment, Defendant Junior continued to harass, abuse, and intimidate Plaintiff.

Defendant Junior controlled Plaintiff, called her his "possession" and told Plaintiff she could not leave him or seek employment elsewhere.  Plaintiff was trapped in her job and Defendant Junior's home.  Defendant Junior would not have engaged in this controlling, dominating, and abusive behavior over Plaintiff if not for her gender.

28.     On one occasion when Plaintiff text messaged to Defendant Junior the idea of leaving her job, and Defendant Junior stated, "Lol….absolutely not….i love having u in the office …..but sometimes i think it would be better for u.  Plus I love office sex with u so I would never want to give That up…lol"



29.     It could not be clearer that Defendant Junior's vile actions and control over Plaintiff was because of her gender.  On another occasion, Defendant Junior called Plaintiff the C-word, in yet another display of gender discrimination and harassment.

30.     Defendant Senior was aware of and observed many instances of Defendant Junior's violent, abusive, and harassing conduct to Plaintiff but failed to

take any remedial action.   In some cases, Defendant Senior also harassed, intimidated, mocked, and bullied Plaintiff.  Defendant Senior thus aided and abetted in Defendant Junior's acts of gender discrimination, harassment, and domestic violence toward Plaintiff.

31.    Plaintiff frequently and openly used her cell phone to videotape Defendants' abuse and harassment toward Plaintiff, in an effort to protect herself from Defendants' conduct.  Shockingly, this tactic did nothing to protect Plaintiff.

32.    In one video recording, Defendant Junior approached Plaintiff's cell phone while she was recording, looked and whispered directly at the cell phone ***"You're in Carneys Point, good luck."***  Seconds after, Defendant Junior shoved his hand into Plaintiff's phone and began striking Plaintiff with physical violence.  The recording's audio emanates clear and horrifying sounds of Defendant's violence, and Plaintiff's shrieks of pain and terror from Defendant Junior's attack.

33.    Plaintiff also recorded Defendant Senior while he mocked Plaintiff for using the cell phone to record him during an incident of harassment by both Defendants.

34.    During spring 2021, in a text message to Plaintiff, Defendant Junior exposed his manipulation tactics by admitting he lied to Plaintiff when he previously told her he wanted to marry her—Defendant stated the tactic was "***a way to try and***

***hold onto you***."  Defendant Junior also acknowledged Defendant Senior's bullying

toward Plaintiff.



35.    Defendant Junior's anger toward Plaintiff resurfaced in May 2021.

During yet another evening involving an anger episode with Plaintiff as the target,

Defendant Junior became enraged and attacked Plaintiff, causing injuries in and

around her upper lip and her right arm.



 

36.     Immediately thereafter, Plaintiff told Defendant Junior she was breaking up with him and moving out.  Defendant Junior replied that Plaintiff was fired and instructed her to clear out her things from the office.  Defendant Junior said

the receptionist Chloe would take over Plaintiff's position.  Plaintiff's employment was thus terminated in direct retaliation for standing up to Defendant Junior's abuse and harassment, which arose as a result of Plaintiff's gender.

37.    Immediately   following   Defendant   Junior   firing   Plaintiff,   he acknowledged his abusive conduct and stated "everything you say about me is right. You are very smart and perceptive."  In his rambling admissions, Defendant Junior continued to apologize stating:

- "I don't want to hurt you no more."

- "I don't want you to be hurt anymore."

- "I won't bother you, I won't harass you, I won't give you bullshit stories or lines."

- "I am really really really … sorry."

38.    The cycle of violence continued the next morning at the office.  As Plaintiff was gathering up her personal belongings, Defendant Junior became enraged and was throwing things off the desk and shelves.  Defendant Junior then physically forced Plaintiff down the hallway and pushed her out of the office. Thereafter, Defendant Junior sent Plaintiff a text message stating, "Please leave the office key on the counter."



39.     On May 27, 2021, Plaintiff received a termination letter citing clearly pretextual excuses to wrongfully terminate Plaintiff.

40.     Plaintiff was an exemplary employee and any reason to terminate her was pretextual.  In fact, on June 6, 2021, Defendant Junior wrote Plaintiff a positive recommendation letter outlining Plaintiff's extensive work experience, skill, and achievements and even stated that Plaintiff's "workload is comparative to that of an associate attorney."

41.     Following Plaintiff's termination, Defendant repeatedly apologized to Plaintiff for his abusive and harassing conduct.  Some examples of his admissions include, but are not limited, to the following:

- "I won't bother you."

- "I won't harass you."

- "I will continue my anger management to address my rage."

- "I will work with a life coach to address my lying and overall decision making on life.  That includes my unconscionable lying!"

42.     Nevertheless, following Plaintiff's wrongful termination, Defendants continued to harass, intimidate, abuse, and retaliate against Plaintiff.  Furthermore, Defendant Junior sought to keep Plaintiff from moving out of his residence.  With no income and nowhere to go, Plaintiff unfortunately felt forced to stay until she could get steady employment and income.  Thus, Plaintiff's termination was in fact a ploy for Defendant Junior to further strengthen his control over Plaintiff more than ever before.

43.     On or about July 22, 2021, in a fit of rage, Defendant Junior threw a lap tray at Plaintiff while she was showering and proceeded to attack her.  Plaintiff was struck in the face badly.  Realizing that he had beaten her worse than ever, Defendant Junior called the police.  When police arrived on the scene, they recognized the severity of her injuries and sent her to the hospital.  The hospital report noted her "swelling and purple bruising to right side upper lip, right cheek and forehead" and that Plaintiff said Defendant Junior assaulted her.

44.     Following this continued cycle of abuse and domestic violence, Defendant Junior wrote Plaintiff a multi-page, handwritten letter on August 28,

2021, once again apologizing for, among other things, his abusive conduct—"I get

angry and freak out"—and "unconscionable lying."

I am going to start to meditate daily. Finally, I am going to start to workout more. Finally Finally (lol) I am going to stop lying (may take some week, but I will get there)

Better Man: I have long put on a facade of being an asshole and cocky. But that's not a Real Man!!! A Real Man is caring, has humility and is protective of the ones he loves at all cost. I know this! But I have always been in this shell of a life that I never had to be a real man, bc I always knew my Dad would protect me. Well whether I am ready or not I am breaking free of that shell, I will either sink smk

Better Lover: I forgot this one, but it is important!!

I want to say I love you more, I want to tell you how beautiful you are and how you feel it deeply and I will do this and make it happen.

When I say this I don't necessarily mean sex. However, I will and want to be more provocative in bed, I love experimental sex I have just gotten lazy and boring and I am so sorry!!! But, mor importantly I want to share you more love, I want to share you more positive positive emotion and explore my feelings with you more, I want to sleep in bed with you.

18

45.     Unfortunately, Defendant Junior's odd and apologetic words rang

hollow once again, and Defendant Junior's abusive ways persisted.

46.     On September 23, 2021, Defendant Junior sent the following email to

Plaintiff and apparently Defendant Senior.



Joseph DiNicola Jr <jrdinicola@dinicola.com>
To: Kristen Rose <kristen21185@gmail.com>
Cc: Joseph DiNicola Jr <jrdinicola@dinicola.com>

Thu, Sep 23, 2021 at 7:49

This email is for both of you.

Monday and many of the other drama filled nights as been a result of my anger and my inability to stop a fight before it starts. I apologize for that and I am working extremely hard on trying to fix that. Dad as we have discussed 80% of the fights between Kristen and me are the result of my inability to stop the escalation. It's not right or fair to either of you or the girls. I am working very hard on getting myself right for everyone.

Kristen, no one is asking you to leave or live on the street. The girls love you and so do I.

Finally, since you are both being children and are unwilling to care for me after my surgery and through my recovery I have decided not to go through with it at this time.

Thanks

Joe Jr

47.     In early November, Plaintiff moved to Delaware to be free from

Defendant Junior's control, harassment, and intimidation. But Plaintiff's freedom

was short-lived. On November 20, 2021, just five (5) days after Plaintiff moved out,

Defendant Junior crossed states lines into Delaware with the sole purpose to harass,

intimidate, and assault Plaintiff.  Defendant Junior broke into Plaintiff's apartment

and threatened and assaulted Plaintiff, knocking her to the ground.  Plaintiff's

neighbors heard Plaintiff's screams and called the police, but Defendant Junior ran away before they arrived. The police immediately issued a warrant for Defendant Junior's arrest.

48.    Ignoring the obvious fact that Plaintiff ended the relationship, Defendant Junior harassed her for days with emails, texts, and calls, all while Plaintiff was trying to learn a new job in a new state. Defendant Junior was trying to sabotage Plaintiff's efforts to move on.

49.    On December 6, 2021, the New Castle County Police issued a Restraining Order prohibiting Defendant Junior from making any contact with Plaintiff.

50.    Unfortunately, Defendant Junior has ignored the Restraining Order and has continued to harass and intimidate Plaintiff. Defendant Junior violated the no contact order three (3) separate times, receiving three (3) separate, additional warrants for his arrest all within a week after his initial arraignment. Upon information and belief, Defendant Junior has provided negative references to Plaintiff's prospective employers and has made it nearly impossible for Plaintiff to find and maintain new employment.

51.    Defendants finally ceased communications and contact with Plaintiff after her counsel sent Defendant Junior a litigation-hold letter in April 2022.

52.     It is imminently clear Defendants terminated Plaintiff in direct retaliation of her decision to escape Defendants' sexual harassment and intimidation, and for her complaints of sexual harassment, intimidation, and abuse in the workplace.

53.     Plaintiff's wrongful termination would not have occurred but for her gender.

54.     Plaintiff's injuries and severe emotional distress caused by Defendant Junior would not have occurred but for her gender.

55.     Defendants never took Plaintiff's complaints seriously and failed to take any measures to protect Plaintiff from Defendants' severe and pervasive harassment.

56.     In addition to the above harassment, Defendants repeatedly failed to conduct an adequate investigation and take the remedial action necessary to protect Plaintiff from further sexual harassment and intimidation.

57.     Defendants did not have an effective anti-harassment policy in place, Defendants have not maintained an anti-harassment policy that is current and effective, and Defendants' anti-harassment policy existed in name only.

58.     Defendants did not maintain useful formal and informal complaint structures for victims of harassment.

59.     Defendants did not properly train its supervisors and/or employees about harassment or retaliation.

60.     Defendants failed to institute appropriate monitoring mechanisms to check the effectiveness of the policies and complaint structures.

61.     Defendants did not have a commitment from the highest levels of management that harassment will not be tolerated; in fact, some of the highest levels of management deliberately ignored complaints of harassment.

62.     Defendants failed to conduct prompt and thorough investigations of employee complaints of harassment or provide a remedial plan reasonably calculated to stop any harassment that is found.

63.     As a result of Defendants' behavior, Plaintiff suffered and continues to suffer from extreme emotional distress and other related damages.

64.     Plaintiff would not have suffered the aforementioned sexual harassment and retaliation but-for her gender.

## <u>COUNT ONE</u>

## <u>NJLAD – DISPARATE TREATMENT, SEXUAL HARASSMENT, & HOSTILE WORK ENVIRONMENT DISCRIMINATION DUE TO GENDER/SEX</u>

65.     Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

66.    The pattern and practice of discrimination and harassment directed at Plaintiff is outlined above.

67.    Plaintiff was subjected to repeated, pervasive, severe, and continuing instances of disparate treatment and harassment based on gender/sex.

68.    The above-described conduct would not have occurred but for Plaintiff's gender.

69.    The harassing and discriminatory conduct was severe or pervasive enough to make a reasonable person and employee believe that the conditions of employment were altered, and the working environment was hostile and discriminatory.

70.    As the employer and/or supervisor of Plaintiff, Defendants are vicariously, strictly, and/or directly liable to Plaintiff pursuant to the NJLAD, N.J.S.A. 10:5-1, *et seq.*, in that the affirmative acts of harassment and discrimination committed by Individual Defendants occurred within the scope of their employment; the creation of the hostile work environment was aided by Corporate Defendant in delegating power to Individual Defendants to control the day-to-day working environment; and/or Corporate Defendant was deliberately indifferent, reckless, negligent and/or tacitly approved the discrimination, hostile work environment, and/or retaliation; and/or Corporate Defendant and Individual Defendants failed to create and/or have in place well-publicized and enforced anti-harassment policies,

effective formal and informal complaint structures, training, and/or monitoring mechanisms for same despite the foreseeability of harassment, discrimination, and retaliation in the workplace; and/or by having actual knowledge of the harassment, discrimination, and retaliation of Plaintiff and failing to promptly and effectively act to stop it.

71.    Defendants aided, abetted, incited, compelled and/or coerced, and/or attempted to aid, abet, incite, compel and/or coerce Individual Defendants to commit acts and omissions that were in violation of the NJLAD by committing affirmatively harassing, and discriminatory, acts toward Plaintiff in violation of the supervisory duty to halt or prevent harassment, retaliation, and discrimination, rendering all Defendants individually and collectively liable to Plaintiff pursuant to N.J.S.A. 10:5-12(e).

72.    Individual Defendants aided, abetted, incited, compelled and/or coerced, and/or attempted to aid, abet, incite, compel and/or coerce Defendants to commit acts and omissions that were in violation of the NJLAD by committing affirmatively harassing, discriminatory, and retaliatory acts toward Plaintiff in violation of their supervisory duty to halt or prevent harassment, retaliation, and discrimination rendering Defendants individually and collectively liable to Plaintiff pursuant to N.J.S.A. 10:5-12(e).

73.    As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under NJLAD, punitive damages, pre-and post-judgment interest, attorneys' fees and costs of suit and for such other relief that the Court deems equitable and just. More specifically, Plaintiff demands judgment against Defendants for harm suffered in violation of the NJLAD as follows:

A.    Reinstatement of employment and all benefits;
B.    Back pay and benefits;
C.    Front pay and benefits;
D.    Compensatory damages;
E.    Consequential damages;
F.    Reinstatement;
G.    Punitive damages;
H.    Prejudgment interest and enhancements to off-set negative tax consequences;
I.    Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);
J.    Such other relief as may be available pursuant to the NJLAD and which the Court deems just and equitable;
K.    Ordering Defendants to take appropriate corrective action to stop and prevent retaliation at the workplace;
L.    Ordering Defendants to take appropriate corrective action to stop and prevent harassment at the workplace;
M.    Ordering Defendants to undergo anti-discrimination training;
N.    Ordering Defendants to undergo anti-retaliation training;
O.    Ordering Defendants to undergo anti-harassment training;
P.    Ordering Defendants to undergo workplace civility training;

Q.      Ordering Defendants to undergo bystander intervention training;

R.      Ordering Defendants to engage a research organization to assess the effectiveness of their anti-discrimination training;

S.      Ordering Defendants to engage a research organization to assess the effectiveness of their anti-retaliation training;

T.      Ordering Defendants to engage a research organization to assess the effectiveness of their anti-harassment training;

U.      Ordering Defendants to engage a research organization to assess the effectiveness of their workplace civility training;

V.      Ordering Defendants to engage a research organization to assess the effectiveness of their bystander intervention training;

W.      Ordering Defendants to identify an appropriate professional to investigate any future complaints of discrimination;

X.      Ordering Defendants to identify an appropriate professional to investigate any future complaints of harassment;

Y.      Ordering Defendants to identify an appropriate professional to investigate any future complaints of retaliation; and

Z.      Such other relief as may be available and which the Court deems just and equitable.

## COUNT TWO

## NJLAD – RETALIATION/IMPROPER REPRISAL

74.     Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

75.     Plaintiff complained and/or protested against the continuing course of harassing, discriminatory, and retaliatory conduct set forth at length above. Defendants had knowledge about those complaints and/or protests.

76.     Plaintiff was affirmatively and/or constructively terminated by Defendants in retaliation for making complaints about Defendants' conduct and due

to Defendants' failure to take corrective and remedial action.  As a direct result, Defendants took retaliatory action against Plaintiff, which is outlined above.

77.    Defendants are vicariously, strictly and/or directly liable to Plaintiff for unlawful retaliatory conduct in violation of the NJLAD pursuant to N.J.S.A. 10:5-12(d).

78.    As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained emotional and pecuniary damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under the law, punitive damages, pre-and post-judgment interest, attorneys' fees and costs of suit.  More specifically, Plaintiff demands judgment against Defendants for harm suffered in violation of the NJLAD as follows:

A.    Reinstatement of employment and all benefits;
B.    Back pay and benefits;
C.    Front pay and benefits;
D.    Compensatory damages;
E.    Consequential damages;
F.    Reinstatement;
G.    Punitive damages;
H.    Prejudgment interest and enhancements to off-set negative tax consequences;
I.    Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);
J.    Such other relief as may be available pursuant to the NJLAD and which the Court deems just and equitable;

27

K.     Ordering Defendants to take appropriate corrective action to stop and prevent retaliation at the workplace;

L.     Ordering Defendants to take appropriate corrective action to stop and prevent harassment at the workplace;

M.     Ordering Defendants to undergo anti-discrimination training;

N.     Ordering Defendants to undergo anti-retaliation training;

O.     Ordering Defendants to undergo anti-harassment training;

P.     Ordering Defendants to undergo workplace civility training;

Q.     Ordering Defendants to undergo bystander intervention training;

R.     Ordering Defendants to engage a research organization to assess the effectiveness of their anti-discrimination training;

S.     Ordering Defendants to engage a research organization to assess the effectiveness of their anti-retaliation training;

T.     Ordering Defendants to engage a research organization to assess the effectiveness of their anti-harassment training;

U.     Ordering Defendants to engage a research organization to assess the effectiveness of their workplace civility training;

V.     Ordering Defendants to engage a research organization to assess the effectiveness of their bystander intervention training;

W.     Ordering Defendants to identify an appropriate professional to investigate any future complaints of discrimination;

X.     Ordering Defendants to identify an appropriate professional to investigate any future complaints of harassment;

Y.     Ordering Defendants to identify an appropriate professional to investigate any future complaints of retaliation; and

Z.     Such other relief as may be available and which the Court deems just and equitable.

## COUNT THREE

## NJLAD – *QUID PRO QUO* SEXUAL HARASSMENT AND DISCRMINATION

79.     Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

80.     Plaintiff was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors.

81.     If Plaintiff did not continue acceding to sexual demands and domestic abuse, or otherwise take part in the sexual promiscuity, Defendants, among other things, threatened Plaintiff and/or instilled fear in Plaintiff that she would lose her job, receive unfavorable performance reviews, be passed over for promotions, or suffer other adverse employment consequences.

82.     Defendants had knowledge of such conduct.

83.     As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained emotional and pecuniary damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under NJLAD, punitive damages, pre-and post-judgment interest, attorneys' fees and costs of suit and for such other relief that the Court deems equitable and just.

## COUNT FOUR

## ASSAULT

84.     Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

85.     By intentionally striking Plaintiff, Defendant Junior purposely, knowingly, and recklessly caused bodily injury to Plaintiff.

86.     Defendant Junior struck Plaintiff knowingly, willfully, and with malicious intent, and Plaintiff is entitled to punitive damages.

87.     Defendant Junior was an employee of Corporate Defendant when he committed the acts intended to cause and causing Plaintiff to suffer apprehension of an immediate harmful contact.

88.     Defendants, despite having actual or constructive notice of the conduct of Defendant Junior, were deliberately indifferent and acquiesced to same, proximately causing damages to the Plaintiff.

89.     On account of the conduct of Defendants, Plaintiff has been injured.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, punitive damages, pre-and post-judgment interest, attorney's fees and costs of suit, and for such other relief that the Court deems equitable and just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff KRISTEN ROSE, on behalf of himself and all others similarly situated, hereby demands a jury trial with respect to all issues triable of right by jury.

## **CERTIFICATION**

It is hereby certified pursuant to 28 U.S.C. § 1746 and pursuant to L.Civ.R. 11.2 that the matter in controversy is not presently the subject of any other action

pending in any court or of an arbitration proceeding to date.

By: /s/ Matthew A. Luber, Esq.
    Matthew A. Luber, Esq. – NJ ID # 017302010
     mal@njlegal.com
    Kelly E. Adler, Esq. - NJ ID # 01942008
     kea@njlegal.com
    Charles J. Kocher, Esq. - NJ ID # 016952004
     cjk@njlegal.com
    Jeffrey D. Ragone, Esq. – NJ ID # 276772018
     jdr@njlegal.com
    McOMBER McOMBER & LUBER, P.C.
    39 East Main Street
    Marlton, New Jersey 08053
    (856) 985-9809
    (732) 530-8545 Fax

*Attorneys for Plaintiff Kristen Rose*

Dated:   September 30, 2022